UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMERISURE MUTUAL INSURANCE CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15-CV-509-SPM |
| | ) | |
| FEDERAL INSURANCE CO. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case is before the Court on the cross-motions for partial summary judgment filed by Plaintiff Amerisure Mutual Insurance Company ("Amerisure") (Doc. 42) and Defendant and Counterclaim Plaintiff Federal Mutual Insurance Company ("Federal") (Doc. 40).[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 14). For the reasons stated below, Federal's motion will be granted in part and denied in part, and Amerisure's motion will be denied.

### I.    FACTUAL BACKGROUND[2]

This case involves a dispute between two insurers, Amerisure and Federal, over their coverage obligations with respect to a lawsuit brought against their insureds in state court (the "Underlying Action").

### A.  The Underlying Action

On October 16, 2008, John Gillis approached his car in a parking garage and found a

---

[1] Although the motions are not titled motions for "partial" summary judgment, the Court notes that neither party's motion expressly addresses Count V of Federal's Counterclaim (Breach of Contract).

[2] Except as otherwise noted, these facts are taken from the statements of undisputed material facts submitted by the parties.

package next to the driver's door. When he attempted to move the package in order to enter his car, the package exploded and caused him serious injuries. The parking garage where this occurred (the "Parking Facility") is located in a building at 190 Carondelet Plaza in Clayton, Missouri. The owner of the building was KBS Clayton Plaza, LLC ("KBS"). Pursuant to a Property Management Agreement between KBS and CB Richard Ellis, Inc. ("CBRE"), the building where the Parking Facility was located was managed by CBRE. Pursuant to a Parking Garage Management Agreement between KBS and St. Louis Parking Company ("St. Louis Parking"), St. Louis Parking managed, operated, and maintained the Parking Facility. The parking garage had security cameras at the elevator lobbies and the entrances, which were monitored by Blackwell Professional Support Services, Inc. ("Blackwell") and not by St. Louis Parking. (Deposition of Brian Dumstorff ("Dumstorff Dep."), Doc. 43-6, at 20-21).

On October 15, 2013, Mr. Gillis filed a lawsuit in the Circuit Court of St. Louis County, Missouri, naming as defendants KBS, CBRE, St. Louis Parking, and Blackwell. Mr. Gillis's petition was entitled "Petition for Damages—Premises Liability" and alleged, *inter alia*, that "the parking garage area where the explosion occurred was in the actual or constructive joint control and possession of" the defendants; that the defendants had a duty to keep the parking garage safe; that defendants KBS and/or CBRE had engaged a security company because they knew of the potential for the parking garage to become unsafe; that video surveillance showed that the package had been placed beside Gillis's car the day before the explosion; that the person who placed the package had "entered the building wearing a highly suspicious and unusual costume or apparel" that should have put the defendants and their agents on notice of the unusual nature of the entry and the package; that the package was witnessed by numerous persons, "including but not limited to the package being observed by the security video surveillance for the parking garage"; that none of the defendants or their agents did any investigation of the package despite its unusual and

conspicuous nature; that the defendants were responsible for allowing a dangerous and unsafe condition to be created and exist in the parking garage; that the defendants knew or should have known of the danger created by the package; and that the defendants failed to use ordinary care to make the parking garage reasonably safe. (Petition, *Gillis v. KBS et al.*, Doc. 43-5, ¶ 10-12, 17-21).

On March 19, 2014, KBS asserted a cross-claim against St. Louis Parking, seeking complete indemnification for the Underlying Action pursuant to the Parking Garage Management Agreement, which required St. Louis Parking to defend, indemnify, and hold harmless KBS from claims arising out of or connected with the operation, management, or maintenance of the Parking Facility. (Doc. 18-3; Doc. 43-3, ¶ 4.2). On March 3, 2015, the court awarded partial summary judgment to KBS, finding that St. Louis Parking was required to defend and indemnify KBS for "allegations arising out of the management of the parking garage." (Doc. 43-13). The court reserved ruling as to whether St. Louis Parking was required to defend and indemnify KBS for "allegations arising out of the viewing of security footage in the attached building." (*Id.*). On August 27, 2015, all four defendants entered into a confidential Release and Settlement Agreement with Gillis in the Underlying Action.

## B. Relevant Policy Provisions

Both Federal and Amerisure issued insurance policies that arguably provide coverage to KBS, CBRE, and/or St. Louis Parking with respect to the Underlying Action. Several provisions of those policies are relevant to the instant dispute.

### 1. The Federal Policy (Issued to KBS)

At the time of the occurrence giving rise to the Underlying Action, KBS was covered by a policy of general liability and garage-keepers' liability issued by Federal (the "Federal Policy"). The Federal Policy, No. 3586-79-30 NBO, included coverage for the Parking Facility at 190 Carondelet Plaza. The "Who is an Insured" section in the Federal Policy includes the following

provision:

> *Real Estate Managers*
>
> Persons (other than your employees) or organizations acting as your real estate managers are insureds; but they are insureds only with respect to their duties as your real estate managers.

(Federal Policy, Doc. 43-2, at 35). The term "Real Estate Managers" is not defined in the Federal

Policy.

The Federal Policy also contains an "Other Insurance" provision that states, in relevant

part:

> If other valid and collectible insurance is available to the insured for loss we would otherwise cover under this insurance, our obligations are limited as follows.
>
> *Primary Insurance*
> This insurance is primary except for the excess insurance provisions described below applies.
>
> If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in the Method of Sharing provision described below.
>
> *Excess Insurance*
> This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:
> ***
> D.      that is insurance:
> 1.      provided to you by any person or organization working under contract or agreement for you; or
> 2.      under which you are included as an insured . . .
>
> ***
> **Method of Sharing**
>
> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this method each insurer contributes equal amounts until it has paid its applicable limits of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio

4

of its applicable limits of insurance to the total applicable limits of insurance of all insurers.

(Federal Policy, Doc. 43-2, at 50-51).

## 2. The Amerisure Policy (Issued to St. Louis Parking)

At the time of the occurrence giving rise to the Underlying Action, St. Louis Parking was covered by a commercial general liability policy, No. GL2026872030008, issued by Amerisure (the "Amerisure Policy"). The Parking Facility is identified on the Schedule of Covered Premises set forth in the Amerisure Policy.

The Amerisure Policy contains an "Advantage Blanket Additional Insured Endorsement" that amends the "Who Is an Insured" section as follows:

to include as an insured any person or organization, called an additional insured in this endorsement:

1. Whom you are required to add as an additional insured on this policy under a written contract or agreement relating to your business; or

2. Who is named as an additional insured under this policy on a certificate of insurance.

***

The insurance provided to the additional insured is limited as follows:

1. That person or organization is only an additional insured with respect to liability arising out of:

(a) Premises you own, rent, lease, or occupy, or

(b) Your ongoing operations performed for that additional insured, unless the written contract agreement, or certificate of insurance requires "your work" coverage (or wording to the same effect) in which case the coverage provided shall extend to "your work" for that additional insured.

(Amerisure Policy, Doc. 43-1, at 180).

The Parking Garage Management Agreement required St. Louis Parking to purchase and maintain Comprehensive Garage Liability Insurance and Commercial General Liability Insurance

naming KBS and CBRE as additional insureds. (Doc. 43-3, at ¶ 4.1). A Certificate of Liability Insurance for the relevant period was issued that states that CBRE and KBS are additional insureds under the Amerisure Policy. (Doc. 18-2).

The Advantage Blanket Additional Insured Endorsement also states that it amends Section IV of the Commercial General Liability Conditions as follows:

> Condition 4. Other Insurance is deleted and replaced with the following:
>
> 4. Other Insurance.
>
> This insurance is excess over any other insurance whether primary, excess, contingent or any other basis, unless the written contract, agreement or certificate of insurance requires that this insurance be primary, in which case this insurance will be primary without contribution from such other insurance available to the additional insured.

(Amerisure Policy, Doc. 43-1, at 181).

## C. The Instant Action

On February 16, 2015, Amerisure filed a Declaratory Judgment Action in the Circuit Court of the County of St. Louis, Missouri. (Doc. 7). Federal removed the case to this Court on the basis of diversity jurisdiction. (Doc. 1). In its Petition, Amerisure seeks a declaration that (A) St. Louis Parking is an insured under the Federal Policy; and (B) the Federal Policy must provide pro rata coverage with the Amerisure policy to St. Louis Parking. On June 11, 2015, Federal filed its First Amended Counterclaim for Declaratory Judgment, asserting five counts. (Doc. 18). In Counterclaim Count I, Federal seeks a declaration that Amerisure owes a duty to defend KBS as an additional insured under the Amerisure Policy and that its coverage to KBS as an additional insured is primary. In Count II, Federal seeks a declaration that Amerisure owes a duty to indemnify KBS as an additional insured under the Amerisure Policy and that the Amerisure Policy's coverage is primary. In Count III, Federal seeks a declaration that Amerisure owes a duty to defend CBRE and that the Amerisure Policy's coverage is primary. In Count IV, Federal

seeks a declaration that Amerisure owes a duty to indemnify CBRE and that the Amerisure Policy's coverage is primary. In Count V, Federal seeks a declaration that Amerisure's failure to reimburse Federal for KBS's defense costs constitutes a breach of contract.

Amerisure now moves for summary judgment on its claim for declaratory relief and on Counts I through IV of Federal's Counterclaim, and it seeks an order requiring Federal to reimburse Amerisure for all monies Amerisure has paid out on behalf of KBS. In its cross-motion, Federal moves for summary judgment on Amerisure's claim and on Counts I through IV of its Counterclaim. Federal also moves for a summary judgment finding that Amerisure is liable for its policy limits, attorney fees, and expenses for its failure to defend KBS and CBRE, because Amerisure's refusal to defend was vexatious. Federal has not pleaded a claim for vexatious refusal.

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

The standards applicable to summary judgment motions are well settled, and they do not change when both parties have moved for summary judgment. *See Tower Rock Stone Co. v. Quarry & Allied Workers Local No. 830*, 918 F. Supp. 2d 902, 905 (E.D. Mo. 2013) (citing *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)). The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial responsibility of informing the court of the basis of its motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the

moving party meets this initial burden, the nonmoving party must then set forth affirmative evidence from which a jury might return a verdict in his or her favor. *Anderson*, 477 U.S. at 256-57. The nonmoving party "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).

When parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law. *Husinga v. Federal-Mogul Ignition Co.,* 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007). "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Wermager*, 716 F.2d at 1214.

III. DISCUSSION

A. Amerisure's Claim for a Declaration That St. Louis Parking Is an Insured Under the Federal Policy

In its Petition, Amerisure seeks a declaration that St. Louis Parking is an insured under the Federal Policy, arguing that St. Louis Parking is KBS's "Real Estate Manager." Amerisure and Federal each move for summary judgment on this issue. For the following reasons, the Court finds that St. Louis Parking is not a real estate manager. Therefore, Federal's motion will be granted, and Amerisure's motion will be denied.

Under the Federal Policy, "Persons (other than [KBS's] employees) or organizations acting as [KBS's] real estate managers are insureds; but they are insureds only with respect to their

duties as [KBS's] real estate managers." Amerisure argues that St. Louis Parking is KBS's "real estate manager" because St. Louis Parking manages certain real estate for KBS—the parking garage at 190 Carondelet Plaza—pursuant to the terms of the Parking Garage Management Agreement. Federal argues that CBRE, and not St. Louis Parking, is KBS's real estate manager, and that St. Louis Parking managed only parking operations and not real estate.

Under Missouri law, which applies in this diversity case, the rules governing the interpretation of insurance policies are well-settled. "When interpreting insurance policy language, courts give a term its ordinary meaning unless it plainly appears that a technical meaning was intended." *Mendenhall v. Prop. & Cas. Ins. Co. of Hartford*, 375 S.W.3d 90, 92 (Mo. 2012) (citing *Farmland Indus., Inc. v. Republic Ins. Co.,* 941 S.W.2d 505, 508 (Mo. 1997)). The plain or ordinary meaning is "the meaning that the average layperson would understand." *Shahan v. Shahan*, 988 S.W.2d 529, 535 (Mo. 1999). "To determine the ordinary meaning, [the court] consults standard English language dictionaries." *Id.*; *see also Mendenhall*, 375 S.W.3d at 92. If there is "duplicity, indistinctness, or uncertainty in the meaning of the language in the policy," such that the language is "reasonably open to different constructions," then the language is ambiguous. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. 2010) (quotation marks omitted). Ambiguities are resolved in favor of the insured. *Mendhenhall*, 375 S.W. at 92.

The term "real estate manager" is not defined in the Federal Policy, and there is nothing in the policy to plainly indicate that a technical meaning was intended. No Missouri courts have defined the term. Therefore, the Court must apply the plain and ordinary meaning that the average layperson would give the term. According to the Merriam-Webster Online Dictionary, the definition of "real estate" is "property in buildings and land." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/real estate (last visited April 25, 2016). The definition of "manager" is "a person who conducts business or household affairs."

Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/manager (last visited April 25, 2016). These definitions suggest that the plain and ordinary meaning of the term "real estate manager" is one who manages or conducts the business affairs of property in buildings or land.

To support its argument that St. Louis Parking was KBS's real estate manager, Amerisure points to the Parking Garage Management Agreement, under which St. Louis Parking agreed to "use its best efforts and all due diligence to manage, operate and maintain the Parking Facility in accordance with the standards generally prevailing in the City of Clayton, Missouri, for the management, operation and maintenance of first-class parking garages by reputable, independent management companies." (Doc. 43-3, Parking Garage Management Agreement, ¶ 3.1). The agreement also provides, *inter alia*, that St. Louis Parking "shall prepare and submit to [KBS] a proposed Operating Budget and a proposed Capital Budget for the operation, repair, maintenance, and improvement of the Parking Facility"; "shall attend to the making and supervision of all ordinary and extraordinary repairs, decorations and alterations of the Parking Facility," subject to certain limits; "shall cause to be provided, or contract to have provided, all at [KBS]'s expense, electricity, water, telephone, sweeping, cleaning, trash removal, repairs, maintenance, security, and other similar services, to the extent such services are either necessary for the proper operation and maintenance of the Parking Facility"; shall recommend capital improvements to KBS when necessary or desirable; and shall receive from KBS "a management fee equal to three percent (3%) of the Net Operating Income" of the Parking Facility. (*Id.* ¶¶ 3.5, 3.7, 3.8, 7.1). Amerisure argues that these duties show that St. Louis Parking managed the business affairs of the parking garage and was therefore a "real estate manager."

The terms of the Parking Garage Management Agreement do indicate that St. Louis Parking "managed" several aspects of the Parking Facility for KBS. In addition, the Court will

assume, without deciding, that some of the duties described in the agreement related to repairs, maintenance, security, and capital improvements might come close to constituting management of the affairs of the "real estate" of the parking garage—the property of the building itself. However, the uncontroverted deposition testimony of Brian Dumstorff of St. Louis Parking shows that St. Louis Parking was not actually the party responsible for performing those duties.

When asked "what duties St. Louis Parking performed" for the parking garage at 190 Carondelet, Mr. Dumstorff simply stated, "We did the billing for it, for all the monthly tenants. We collected all the transient revenue through our cashiers, and then cleaned the garage." (Dumstorff Dep., Doc. 43-6, at 14.) With respect to the duties more closely related to the management of the building itself, Mr. Dumstorff repeatedly indicated that such duties were performed not by St. Louis Parking but by CBRE, which he referred to as "the property manager." When asked whether St. Louis Parking did repairs, he stated, "I would say no. We would have coordinated repairs through the property manager." *Id.* at 36. He also testified that "[a]ny expense over $500 would have had to have been cleared through property management." *Id.* at 31. When asked whether St. Louis Parking took the initiative to report repairs that were needed, he indicated that usually, Mr. Allen Arky of CBRE would notice repairs that needed to be done and that Mr. Arky "handled all the major repairs." *Id.* at 36. He further stated that Mr. Arky and/or CBRE "managed all the concrete work," "did all the lighting," and "would have handled changing all the lightbulbs in the garage or ballasts, any of the fixtures." *Id.* at 63-64. He further testified that St. Louis Parking "didn't manage any of the security" for the Parking Facility and that security "was usually handled by the property management." *Id.* at 63. Mr. Dumstorff also testified that he spoke frequently with "the property manager," a CBRE employee, *id.* at 60, but that he did not have a contact person at KBS and did not specifically recall anyone he had met at KBS, *id.* at 67-68. Mr. Dumstorff's description of CBRE's responsibilities is consistent with the Property Management Agreement

between KBS and CBRE, which states that CBRE "is in the business of managing properties," appoints CBRE "as the manager for the Premises," and gives CBRE broad responsibilities with regard to repairs, maintenance, and interactions with tenants. (Doc. 43-7.)

When the Parking Garage Management Agreement is read together with Mr. Dumstorff's testimony, the picture that emerges is one in which CBRE managed nearly all matters related to the *real estate* of the parking garage at 190 Carondelet Plaza (including building repairs, most maintenance, significant expenditures, and building security), while St. Louis Parking managed the collection of parking revenue and the cleaning of the parking garage. The cleaning and parking revenue collection that St. Louis Parking performed with respect to the parking garage simply do not constitute management of the "real estate" or "property" of the parking garage and do not make St. Louis Parking into a "real estate manager" within any reasonable meaning of that term. St. Louis Parking conducted the affairs of a parking operation located in a building; it did not conduct the affairs of the property of the building.

The Court's conclusion is consistent with conclusions reached by courts in other jurisdictions, which have generally found that to be a "real estate manager," a person or company must manage the "real estate affairs" or "real estate transactions" of the subject real property, not merely conduct business affairs or routine maintenance related to a piece of real property. *See Moon v. Cincinnati Ins. Co.*, 592 F. App'x 757, 758-59 (11th Cir. 2014) (rejecting the argument that lessees were real estate managers because they performed routine maintenance on the home they leased; finding that "the industry term 'real estate manager' implicates real estate transactions rather than routine maintenance"); *Brown v. MR Group, LLC*, 693 N.W.2d 138, 144 (Wis. 2004) (a person who was involved with deciding what sort of business activity to place on a piece of undeveloped real estate and who was intimately involved with implementing that plan was not a real estate manager because he was not "in the business of managing *real estate* affairs vis-à-vis

the subject property").

Indeed, in a case very similar to the instant case, the Eastern District of Pennsylvania found that the manager of a parking garage did not qualify as a "real estate manager" for the owner of the building where the parking garage was located. In *First Liberty Insurance Corp. v. Zurich American Insurance Co.*, No. 12-1127, 2013 WL 638621 (E.D. Pa. Feb. 20, 2013), the insurer for a parking garage operator argued that the parking garage operator qualified as a "real estate manager" under the building owner's policy, such that the parking garage operator was entitled to coverage under the owner's policy with regard to an injury that occurred in the parking garage. *Id.* at *2-*3. As in the instant case, the agreement between the parking garage operator and the owner provided that the parking garage operator would "manage and operate the garage." *Id.* The court rejected the parking garage operator's insurer's argument that the operator was a real estate manager, stating:

> Contrary to First Liberty's contention, Park America is not a real estate manager. Park America is a parking garage operator. It did not manage the real estate. It managed the parking garage business pursuant to a license. It ran a parking garage, not a real estate operation.

*Id.* at *3. The court also noted that the agreement at issue stated that nothing in it should be construed "as constituting a partnership or joint venture between [the parking garage operator and the owner], nor shall their relationship hereunder be deemed to be that of principal and agent, or landlord and tenant." *Id.*

Here, as in *First Liberty*, St. Louis Parking managed a parking garage, not a real estate operation. Its responsibilities were primarily related to the collection of parking revenue and the cleaning of the garage, with a separate company managing most aspects of the property itself. Amerisure attempts to distinguish *First Liberty* because in that case, the parking garage owner was operating under a license and was primarily acting for its own benefit, whereas here the Parking

Garage Management Agreement suggests that St. Louis Parking's operation of the parking garage was for the benefit of KBS. That distinction does not affect the Court's analysis. It is undisputed that, here, St. Louis Parking was managing something for KBS's benefit. The dispute is over whether the thing St. Louis Parking was managing for KBS's benefit was "real estate" or merely parking operations. For the reasons already stated, the Court finds that it was parking operations.

Amerisure's reliance on *Hartford Insurance Co. v. State Farm Fire and Casualty Co.*, 630 So.2d 652 (Fla. Ct. App. 1994), is unavailing. In *Hartford*, the court held that a company was a "real estate manager" for the owner of the property based on the company's extensive contractual obligations to the owner. *Id.* at 653-54. However, the contract in *Hartford* provided that the company was competent and experienced in the area of real estate development, that the company was managing and supervising the development and construction of dwellings and commercial facilities, and that the company had responsibilities related to a sales program for the buildings. *Id.* at 653-54. These are the sort of responsibilities directly related to managing affairs of *real estate* that St. Louis Parking did not have in this case.

For all of the above reasons, the Court will deny Amerisure's motion for summary judgment on its claim seeking a declaration that St. Louis Parking is an insured under the Federal Policy, and it will grant Federal's motion for summary judgment with respect to that claim. Because St. Louis Parking is not an insured under the Federal Policy, the court need not reach the parties' arguments regarding whether any coverage provided by Federal to St. Louis Parking applies on a primary or excess basis.

### B. Federal's Counterclaims Seeking a Declaration that Amerisure Has Defense and Indemnity Obligations to KBS and Those Obligations Are Primary (Counterclaim Counts I and II)

In Counterclaim Count I, Federal seeks a declaratory judgment that Amerisure has an obligation to defend KBS and that Amerisure's coverage to KBS is primary. In Counterclaim

Count II, Federal seeks a declaratory judgment that Amerisure has an obligation to indemnify KBS and that the indemnification obligation is primary. Both parties move for summary judgment on these counterclaims.

### 1. *Amerisure Has a Duty to Defend KBS*

Under Missouri law, "[a]n insurer owes two distinct duties to its insured: a duty to indemnify and a duty to defend." *Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 552 (Mo. 2014). The duty to defend is "broader than its duty to indemnify" and arises "when there is a potential or possible liability to pay based on the facts at the outset of the case." *Id.* (quotation marks omitted). "In determining whether an insurer has a duty to defend, the Court first compares the policy language with the allegations in the petition from the underlying lawsuit. If the underlying petition alleges facts that give rise to a claim potentially covered by the policy, the insurer has a duty to defend." *Id.*

The Court first considers Federal's argument that Amerisure is required to defend KBS as an "additional insured" under the Amerisure Policy. Under the Amerisure Policy's "Advantage Blanket Additional Insured Endorsement," the "Who Is an Insured" section includes as an insured:

> any person or organization, called an additional insured in this endorsement:
>
> 1. Whom you [the named insured, St. Louis Parking] are required to add as an additional insured on this policy under a written contract or agreement relating to your business; or
> 2. Who is named as an additional insured under this policy on a certificate of insurance.

It is undisputed that KBS qualifies an "additional insured" under these provisions, because St. Louis Parking was required by the Parking Garage Management Agreement to add KBS as an additional insured and because KBS was named as an additional insured on the Amerisure Policy on a certificate of insurance. The dispute is over whether the following limitation on the additional insured coverage applies:

The insurance provided to the additional insured is limited as follows:

1. That person or organization is only an additional insured with respect to liability arising out of:

   (a) Premises you own, rent, lease, or occupy, or

   (b) Your ongoing operations performed for that additional insured, unless the written contract agreement, or certificate of insurance requires "your work" coverage (or wording to the same effect) in which case the coverage provided shall extend to "your work" for that additional insured.

Federal does not suggest that St. Louis Parking owned, rented, leased, or occupied the premises at issue, or that any "your work" coverage is present. Thus, KBS has coverage as an additional insured only "with respect to liability arising out of . . . [St. Louis Parking's] ongoing operations performed for [KBS]."

A review of the petition in the Underlying Action demonstrates that it alleges facts that at least potentially create liability arising out of St. Louis Parking's ongoing operations performed for KBS. The petition alleges, *inter alia*, that KBS owned the property containing the parking garage where the injury occurred; that St. Louis Parking had an agreement with KBS and/or CBRE to operate, manage, and control the parking garage; and that all of the defendants, including KBS and St. Louis Parking, were jointly and severally "responsible for allowing a dangerous and unsafe condition to be created and exist in the parking garage . . . and had, or should have had, constructive knowledge of the dangerous and unsafe condition, to-wit an explosive package, and failed to remedy the dangerous and unsafe condition prior to [Gillis] sustaining serious and permanent injuries." (Doc. 43-5, ¶ 11). Because the facts alleged at least potentially give rise to liability on the part of KBS arising out of St. Louis Parking's ongoing operations as the manager of the parking garage KBS owned, Amerisure had a duty to defend

KBS in the Underlying Action. The Court need not reach Federal's other arguments in support of a duty to defend.

> ### 2. Amerisure Has a Duty to Indemnify KBS, but Only With Respect to Liability Arising From St. Louis Parking's Management of the Parking Facility

Federal also seeks summary judgment on its claim that Amerisure has a duty to indemnify KBS with regard to the Underlying Action.[3] As with the duty to defend, Federal argues that Amerisure is obligated to indemnify KBS as an "additional insured" under the Amerisure Policy, because the liability in the Underlying Action was "liability arising out of . . . [St. Louis Parking's] ongoing operations performed for [KBS]."

In contrast to the duty to defend, which turns on whether a petition includes claims potentially covered by a policy, "[t]he duty to indemnify turns on whether the claim is *actually* covered by the Policy." *Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 624 (8th Cir. 2007) (emphasis in original) (applying Missouri law). In order to determine whether an insurer is obligated to indemnify its insured, courts must look to the "facts as they are established at trial or as they are finally determined by some other means, for example through summary judgment or settlement." *McCormack Baron Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.*, 989 S.W.2d 168, 173 (Mo. 1999). Here, all of the claims in the Underlying Action were resolved through a single Confidential Release and Settlement Agreement, and that settlement agreement does not contain any facts to suggest that the settlement was limited to any particular allegations or that the settlement amount was allocated between different allegations or defendants in any particular way.

---

[3]According to Federal, Amerisure paid settlement sums on behalf of KBS, and therefore Federal is not seeking any indemnity payments on behalf of KBS. (Doc. 41 at 18 n.1). However, Federal seeks a declaration that Amerisure owed indemnity obligations to KBS so that Amerisure cannot seek reimbursement of its indemnity payments from Federal or KBS.

Federal argues that *all* of the allegations in the Underlying Action arise out of St. Louis Parking's management of the parking garage for KBS, because all of the allegations are based on the defendants' responsibility for allowing a dangerous and unsafe condition to exist in the parking garage, which St. Louis Parking managed. Amerisure argues, however, that some of the allegations do not arise out of St. Louis Parking's management of the parking garage. Specifically, Amerisure contends that the petition alleges that KBS has liability with respect to security of the building and video surveillance footage for the parking garage, matters separate and distinct from the St. Louis Parking's management of the parking garage.

The Court agrees with Amerisure. The petition alleges generally that all four defendants and their agents (KBS, CBRE, St. Louis Parking, and Blackwell) failed to use ordinary care to make the parking garage reasonably safe. Because St. Louis Parking was generally responsible for parking garage operations, many of these allegations appear to allege liability that would arise out of St. Louis Parking's operations. However, several of the allegations in the petition relate to the building security and video surveillance, and the evidence in the record suggests that those matters were not handled by St. Louis Parking. As Amerisure points out, Gillis alleged that "KBS and/or CBRE engaged the services of separate defendant Blackwell to provide security to 190 Carondelet Plaza because they knew that without proper and ongoing security there was a potential for the building and parking garage to become dangerous or unsafe." (Doc. 43-5, ¶13). The petition alleges that video surveillance showed the package being placed beside the car; that the package was witnessed by numerous persons, "including but not limited to the package being observed by the security video surveillance for the parking garage"; and that none of the defendants or their agents did any investigation of the package despite its unusual and conspicuous nature. These allegations clearly contemplate liability based on the defendants' failure to provide

adequate building security, in particular the failure to adequately monitor the video surveillance and/or the failure to take action based on the video surveillance.

According to uncontroverted deposition testimony provided by Brian Dumstorff, St. Louis Parking "didn't manage any of the security," and security was "usually handled by the property management." (Dumstorff Dep., Doc. 43-6, at 63). He testified that there was video surveillance of the elevator lobbies and the entrances at the parking garages, but that St. Louis Parking did not have responsibility for monitoring the video surveillance cameras. *Id.* at 21. Instead, Blackwell had responsibility for watching the security cameras, which Blackwell did at its desk in the lobby of the building. *Id.* at 21, 69. St. Louis Parking had no interactions with Blackwell with regard to security at the building. *Id.* at 21. Given St. Louis Parking's lack of involvement in video surveillance of the building, any liability based on those allegations does not "arise out of" St. Louis Parking's management of the parking garage, and KBS is not entitled to indemnification with respect to those allegations.

Indeed, the trial court recognized that the Underlying Action involved some allegations against KBS that did not arise from St. Louis Parking's management of the parking garage. In ruling on KBS's motion for summary judgment on its claim seeking indemnification from St. Louis Parking, the trial court divided the allegations into two categories: (1) "allegations arising out of the management of the parking garage, pursuant to the contract between KBS Clayton Plaza, LLC and St. Louis Parking," and (2) "allegations arising out of the viewing of security footage in the attached building." The trial court held that St. Louis Parking was required to indemnify KBS for liability from the first category, but it reserved ruling regarding the second category.

In light of the above, the Court finds that Amerisure is required to indemnify KBS as an "additional insured" with respect to liability based on allegations arising from St. Louis Parking's management of the parking garage, but Amerisure is not required to indemnify KBS as an

additional insured for liability arising from allegations arising out of any matters with which St. Louis Parking was not involved, including the viewing of video surveillance footage of the parking garage. The allocation of the settlement amounts between those two classes of allegations is not a question before this Court.

Federal also argues that Amerisure has a duty to indemnify KBS based on the trial court's order in the Underlying Action finding that St. Louis Parking was obligated to defend and indemnify KBS with regard to allegations arising out of the management of the parking garage (but reserving judgment as to allegations related to the viewing of surveillance footage). The Court need not reach this argument. Assuming, *arguendo,* that the trial court's order could create a duty to indemnify on the part of Amerisure, any such duty would cover only allegations arising from the management of the parking garage, and not allegations related to the video surveillance of the building, and it would be no broader than the duty to indemnify that the Court has already found Amerisure to have under the additional insured endorsement, discussed above.

### 3. *Amerisure's Duty to Defend and Indemnify KBS Applies on a Primary Basis*

Each party also seeks summary judgment on the question of whether Amerisure's obligation to defend and indemnify KBS applies on a primary basis. Federal argues that because the Parking Garage Management Agreement requires St. Louis Parking to defend and indemnify KBS from liability "arising out of or in any manner connected with the operation, management or maintenance of the Parking Facility," St. Louis Parking's insurer (Amerisure) must provide coverage for KBS on a primary basis, regardless of what the "other insurance" clauses in the policies state. Amerisure argues that under the "other insurance" clauses in the policies, either Federal's coverage is primary and Amerisure's is excess, or neither insurer's coverage is primary and the insurers should be required to share coverage for KBS on a pro rata basis.

The Court agrees with Federal that Amerisure's obligation to defend KBS applies on a primary basis because of the indemnification agreement between St. Louis Parking and KBS. *Federal Insurance Co. v. Gulf Insurance Co.*, 162 S.W.3d 160 (Mo. Ct. App. 2009), is directly on point. In *Gulf*, a Sachs employee was injured while performing work at an Aqualon facility, a lawsuit was brought against Sachs and Aqualon, and the parties settled. *Id.* at 162-63. Aqualon was insured under its own policy, and it was also an additional insured under Sachs's insurance policy. *Id.* Each policy contained an "other insurance" provision stating that the policy was excess of other insurance. *Id.* After Sachs's insurer paid sums toward the settlement, it sought contribution from Aqualon's insurer, citing the policies' "other insurance" clauses. *Id.* at 163.

The court first noted the general rule that when two policies contain similar "other insurance" clauses, the clauses are disregarded, and each insurer is required to pay a pro rata share of the loss. *Id.* at 164. However, it noted that "an indemnity agreement between the insureds, or a contract with an indemnification clause . . . may shift an entire loss to a particular insurer notwithstanding the existence of an other insurance clause in its policy." *Id.* at 164-65 (quotation marks omitted). It explained:

> The rationale for this exception is to give effect to the insureds' indemnity agreement. To hold otherwise would render the indemnity contract between the insureds completely ineffectual and would obviously not be a correct result, for it is the parties' rights and liabilities to each other which determine the insurance coverage; the insurance coverage does not define the parties' rights and liabilities one to the other. To apply the "other insurance" provisions to reduce the indemnitor's insurer's liability would serve to abrogate the indemnity agreement between the indemnitor and indemnitee owner. [T]o apportion the loss in this case pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose liability on [owner's insurer] when [owner] bargained with [contractor] to avoid that very result as part of the consideration for the construction agreement.
>
> Further, failure to give effect to the indemnity agreement would result in circuitous litigation which would ultimately end with the excess carrier paying the settlement. Courts should consider obligations under an indemnity agreement

before allocating responsibility for the settlement liability according to the terms of the relevant policies.

*Id.* at 165 (citations and quotation marks omitted). The court found that Sachs's insurer was not entitled to contribution from Aqualon's insurer, because there was a valid indemnification agreement requiring Sachs to indemnify Aqualon with regard to the settlement at issue. *Id.* at 165-66.

Here, as in *Gulf*, St. Louis Parking and KBS agreed that St. Louis Parking would defend and indemnify KBS for liability arising out of or related to St. Louis Parking's management of the parking garage. As in *Gulf*, to apply the "other insurance" provisions to reduce St. Louis Parking's insurer's liability "would serve to abrogate th[at] indemnity agreement" and would "impose liability on [KBS's insurer] when [KBS] bargained with [St. Louis Parking] to avoid that very result as part of the consideration for" the parties' agreement. *See id.* at 165. Such a result is not permitted under Missouri law. It is the indemnity agreement, rather than the other insurance provisions, that governs the priority of coverage.

Amerisure's only argument that *Gulf* does not apply here is premised on its position that unlike Aqualon's insurer in *Gulf*, Federal owes a separate and independent duty to St. Louis Parking as an additional insured under the Federal Policy. That argument is foreclosed by the Court's holding that St. Louis Parking is not an additional insured under the Federal Policy. The Court finds that the defense and indemnity obligations Amerisure owes to KBS are primary.

For all of the foregoing reasons, the Court finds that Amerisure has a duty to defend KBS; that Amerisure has a duty to indemnify KBS, but only as to some allegations in the Underlying Action; and that both of Amerisure's duties to KBS apply on a primary basis. Therefore, Federal's motion will be granted with respect to Counterclaim Count I and granted in

part and denied in part with respect to Counterclaim Count II. Amerisure's motion will be denied with respect to both counterclaims.

### D. Federal's Counterclaims Seeking a Declaration that Amerisure Has Defense and Indemnity Obligations to CBRE and Those Obligations Are Primary (Counterclaim Counts III and IV)

In Counterclaim Count III, Federal seeks a declaratory judgment that Amerisure has an obligation to defend CBRE and that Amerisure's obligation to defend CBRE applies on a primary basis. In Counterclaim Count IV, Federal seeks a declaratory judgment that Amerisure has an obligation to indemnify CBRE and that the indemnity obligation applies on a primary basis. Both parties move for summary judgment on these counterclaims.

#### 1. *Amerisure Has a Duty to Defend CBRE in the Underlying Action*

As discussed above, "[i]f the underlying petition alleges facts that give rise to a claim potentially covered by the policy, the insurer has a duty to defend." *Allen*, 436 S.W.3d at 552. Like KBS, CBRE has coverage as an additional insured under the Amerisure Policy, but only "with respect to liability arising out of . . . [St. Louis Parking's] ongoing operations performed for [CBRE]." Thus, as with the duty to defend KBS, Amerisure has a duty to defend CBRE if the petition in the Underlying Action alleges facts that give rise to a claim potentially creating liability arising out of St. Louis Parking's ongoing operations performed for CBRE.

Federal argues that, as with KBS, Amerisure is obligated to defend CBRE because the allegations in the Underlying Action relate directly to St. Louis Parking's management of the parking garage and therefore arise out of St. Louis Parking's ongoing operations performed for CBRE, KBS's property manager. Amerisure argues that St. Louis Parking did not perform any ongoing operations "for" CBRE, but only for KBS.

Amerisure's argument is disingenuous in light of the undisputed facts of this case. It is undisputed that although CBRE is not a party to the Parking Garage Management Agreement,

CBRE signed the Parking Garage Management Agreement as the property manager for KBS, and St. Louis Parking employees interacted primarily with CBRE as they managed the Parking Facility. In his deposition, Brian Dumstorff of St. Louis Parking admitted that he never communicated with anyone from KBS, but he regularly spoke with, worked with, and cleared things through CBRE. For example, he testified that after the incident at issue, he "would have talked to" to the property management company (CBRE), that "[a]ny expense over $500 would have had to have been cleared through property management [CBRE]," that St. Louis Parking "would have coordinated repairs through the property manager," and that St. Louis Parking "would go over with the property management, any kind of building questions on any kind of things, you know, questions or anything we could help with [] the garage" and would "review with [CBRE] on a regular basis things that were going on and deal most of the time with email communications back and forth on things." (Dumstorff Dep., Doc. 43-6, at 23, 31, 36, 59). In sum, the undisputed facts make clear that St. Louis Parking only worked "for" KBS by working for CBRE.

Moreover, the Parking Garage Management Agreement required CBRE to be named as an additional insured, and CBRE was named an additional insured on the certificate of insurance, indicating that the Agreement plainly contemplated that St. Louis Parking would be performing operations for CBRE. If not, the requirement of additional insured coverage for CBRE would have been completely without purpose or effect.

For all of the above reasons, the Court finds that Amerisure has a duty to defend CBRE in the Underlying Action.

### 2. Amerisure Has a Duty to Indemnify CBRE, but Only With Respect to Liability Arising From St. Louis Parking's Management of the Parking Facility

The Court's analysis of Amerisure's duty to indemnify CBRE parallels the analysis of Amerisure's duty to indemnify KBS. As with KBS, the petition in the Underlying Action certainly alleges that CBRE has some liability that does "aris[e] out of" St. Louis Parking's operations as manager of the parking garage; however, it also alleges that CBRE has some liability as the manager of the premises that does not arise out of St. Louis Parking's operations, in particular allegations related to building security and viewing of video surveillance footage. Thus, as with KBS, the Court finds that Amerisure is required to indemnify CBRE as an "additional insured" with respect to liability based on allegations arising from St. Louis Parking's management of the parking garage, but Amerisure is not required to indemnify CBRE as an additional insured for liability arising from allegations arising out of any matters with which St. Louis Parking was not involved, including the viewing of video surveillance footage of the parking garage. The allocation of the settlement amounts between those two classes of allegations is not a question before this Court.

### 3. Amerisure's and Federal's Defense and Indemnity Obligations With Respect to CBRE Must Be Shared on a Pro Rata Basis

As established above, Amerisure has a duty to defend and indemnify CBRE. The parties do not appear to dispute that Federal also has a duty to defend and indemnify CBRE. Each insurer argues that its policy contains an applicable "other insurance" clause that renders its coverage "excess," such that it applies only when the loss exceeds the coverage provided by the other insurer's policy. "Where two insurance policies providing concurrent coverage both contain other insurance clauses, it is necessary to analyze each other insurance clause to determine whether

one or both insurers is liable for an insured loss." *Wentzville Park Assocs., L.P. v. Am. Cas. Ins. Co.*, 263 S.W.3d 736, 740 (Mo. Ct. App. 2008).

The Amerisure Policy's "Other Insurance" provision, found in the Advantage Blanket Additional Insured Endorsement, states as follows:

> This insurance is excess over any other insurance whether primary, excess, contingent or on any other basis, unless the written contract, agreement, or certificate of insurance requires that this insurance be primary, in which case this insurance will be primary without contribution from such other insurance available to the additional insured.

Federal argues that this clause does not apply, because the Parking Garage Management Agreement specifically requires that St. Louis Parking obtain both primary and excess coverage naming CBRE. That argument is without merit, because there is no language in either the Parking Garage Management Agreement or the Certificate of Insurance that requires St. Louis Parking to obtain insurance for St. Louis Parking that is "primary." Therefore, this other insurance clause plainly applies and purports to render the Federal Policy excess over the Amerisure Policy with respect to CBRE.

The Federal Policy's Other Insurance clause states, in relevant part:

> *Excess Insurance*
>
> This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:
>
> ***
>
> D.    that is insurance:
> 1.    provided to you by any person or organization working under contract or agreement for you; or
> 2.    under which you are included as an insured.

Amerisure argues that this provision does not apply, because the "you" referred to in the Federal Policy is only the named insured, KBS, and not CBRE. That argument is also without merit, because the provision applies to render the Federal Policy excess even when "you" is read as

"KBS." It provides that this insurance (the Federal Policy) is excess over any other insurance under which KBS is included as an insured. KBS is included as an insured under the Amerisure Policy, so the Federal Policy is excess over the Amerisure Policy.

As both Federal and Amerisure acknowledge, where two policies covering the same risk both contain similar "other insurance" clauses, courts "disregard the clauses as 'mutually repugnant' and require the insurers to share the loss." *Farm Bureau Town & Country Ins. Co. of Missouri v. Am. Alternative Ins. Corp.*, 347 S.W.3d 525, 532 (Mo. Ct. App. 2011) (citing *Smith v. Wausau Underwriters Ins. Co.,* 977 S.W.2d 291, 294 (Mo. Ct. App. 1998)); *see also Shelter Mut. Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 223 S.W.3d 905, 906-07 (Mo. Ct. App. 2007) ("'Following contract law, Missouri courts have consistently held that where two policies have competing excess insurance clauses, they are treated as mutually repugnant and disregarded.'") (quoting *Shelter Mut. Ins. Co. v. American Family Mut. Ins. Co.*, 210 S.W.3d 338 (Mo. Ct. App. 2006)). "The rationale for this rule is that if [the court] applied both clauses, the insured would be left without coverage." *Farm Bureau*, 347 S.W.3d at 532. This rule also "functions to avoid conferring a windfall on one insurer at the expense of the other." *Id.* (citing *Planet Ins. Co.,* 920 S.W.2d at 594).

Where the doctrine applies, liability is apportioned between the insurers on a pro rata basis, with each insurer responsible in proportion to the amount of insurance provided by the respective policies. *Farm Bureau*, 347 S.W.3d at 523. *See also State Farm Mut. Auto Ins. Co.*, 223 S.W.3d at 907 (Mo. Ct. App. 2007) ("'Once [competing excess insurance clauses] are disregarded, liability is apportioned between the insurers pro-rata based on the percentage of total liability each provides.'") (quoting *American Family Mut. Ins. Co.*, 210 S.W.3d at 341-42); *Planet Ins. Co. v. Ertz*, 920 S.W.2d 591, 597 (Mo. Ct. App. 1996) (finding other insurance clauses mutually repugnant and holding that pro rata apportionment of liability was proper).

Federal suggests that here, each insurer should pay an equal share rather than a pro rata share. It argues that both policies' "Other Insurance" clauses include a "Method of Sharing" provision stating, "If all of the other insurance permits contribution by equal shares, we will follow this method also." That provision does appear in the relevant "Other Insurance" clause in the Federal Policy. However, that provision does not appear in the relevant "Other Insurance" clause in the Amerisure Policy, as it is amended by the Advantage Blanket Additional Insured Endorsement. There is nothing in the Amerisure Policy that provides for equal sharing with respect to other insurance for additional insureds. Thus, the Court sees no basis on which to depart from the general pro rata sharing approach followed in the Missouri cases cited. The Court finds that the duties owed to CBRE must be apportioned between the insurers on a pro rata basis, with the insurers responsible in proportion to the amount of insurance provided by the respective policies.

For all of the foregoing reasons, the Court finds that Amerisure has a duty to defend CBRE; that Amerisure has a duty to indemnify CBRE, but only as to some allegations in the Underlying Action; and that Amerisure and Federal are required to share coverage of CBRE on a pro rata basis. Therefore, Federal's motion will be granted in part and denied in part with respect to both Counterclaim Counts III and IV. Amerisure's motion will be denied as to both counterclaims.

### E. Vexatious Refusal to Defend

In its motion, Federal asks the Court to enter a summary judgment finding that Amerisure is liable for the limits of its policy, attorney's fees, and expenses, based on Amerisure's vexatious refusal to defend KBS and CBRE. However, as Amerisure points out, Federal has not pleaded a claim for vexatious refusal to defend. Amerisure requests that the Court strike the section of Federal's motion addressing this issue. Federal provides no response other than to state in its Reply brief, "Federal will not pursue its claim for vexatious refusal to defend at this

time, but reserves the right to do so if the Court finds Amerisure has breached its duty to defend KBS or CBRE." (Reply Brief, Doc. 56, at 18).

Because no vexatious refusal claim is before the Court, the Court will strike the section of Federal's motion for summary judgment purporting to seek summary judgment on that claim.

## IV.    CONCLUSION

For all of the reasons stated above, the undisputed facts and controlling Missouri law establish the following: (1) St. Louis Parking is not an "additional insured" under the Federal Policy, because it is not a "real estate manager"; (2) Amerisure has an obligation to defend KBS in the Underlying Action; (3) Amerisure has an obligation to indemnify KBS, but Amerisure's obligation applies only with respect to liability based on allegations arising from St. Louis Parking's management of the parking garage and not to liability arising out of any matters with which St. Louis Parking was not involved, including the viewing of video surveillance footage of the parking garage; (4) Amerisure's defense and indemnity obligations to KBS apply on a primary basis; (5) Amerisure has an obligation to defend CBRE in the Underlying Action; (6) Amerisure has an obligation to indemnify CBRE, but that obligation applies only with respect to liability based on allegations arising from St. Louis Parking's management of the parking garage and not to liability arising out of any matters with which St. Louis Parking was not involved, including the viewing of video surveillance footage of the parking garage; and (7) Amerisure's defense and indemnity obligations to CBRE are to be shared with Federal on a pro rata basis in proportion to the amount of insurance provided by each insurance policy.

Accordingly,

**IT IS HEREBY ORDERED** that Federal's Motion for Summary Judgment (Doc. 40) is **GRANTED IN PART and DENIED IN PART** as stated above.

**IT IS FURTHER ORDERED** that Amerisure's Motion for Summary Judgment (Doc. 42) is **DENIED.**

**IT IS FURTHER ORDERED** that the section of Federal's Motion for Summary Judgment addressing vexatious refusal to defend is **STRICKEN**.

In a separate order, the Court will set a scheduling conference at which the parties will discuss Counterclaim Count V and any remaining issues in the case.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of April, 2016.